**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **ROBERT WHITE** | : **CIVIL ACTION** |
| | : |
| **v.** | : **NO. 1:18-18** |
| | : |
| **FRANK B. DAY, ARTHUR WONG** | : |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                           **April 1, 2026**

Builders agreeing to perform substantial repairs to a home by a certain date must do so or answer for potential breach of contract. This principle applies to agreements to settle earlier-filed cases by substantially completing the defined work of construction repairs by a date certain. We today address an agreement reached by early June 2016 between a builder and his private lenders to resolve a 2013 construction delay case still before us (at No. 1:13-44) by requiring the builder substantially complete a defined set of construction repairs to a home by May 31, 2017 and if so, the private lenders would dismiss their 2013 case against the builder. The parties raise a variety of different stories not material to their central obligations as the undisputed facts confirm the builder did not meet the agreed date proposed by him in early June 2016 when both builder and lenders agreed time is of the essence. The builder nevertheless asks us in this case to declare the 2013 case resolved under their agreement with terms defined by early June 2016. And the lenders responded by asking us to declare the builder did not meet his obligations and they properly terminated their settlement agreement. We find, as a matter of law applied to undisputed material facts, the builder is not entitled to the benefits of the bargain (dismissal of the 2013 case against him). We grant the lenders' summary judgment declaring they properly terminated the settlement agreement for lack of timely performance by the builder. We will next resolve the lenders' 2013 case.

### I.    Undisputed material facts

Private lenders Frank B. Day and Arthur Wong agreed to finance builder Robert White's efforts to build and repair a home on property Builder White owned on St. Croix. Builder White "agreed to contribute his oceanfront lot and to design and build a spec house" and Lenders Day and Wong "agreed to fund the venture" in the form of loans to Builder White to fund construction.[1] Builder White would rebuild the home and then sell the home to repay the loans. Builder White provided a deed in lieu of foreclosure placed in escrow as security for the loan should he not timely repay the obligations.

### *Lenders Day and White obtain partial judgment in the 2013 case.*

The property never sold as they planned, resulting in Builder White not paying the loans, and granting Lenders Day and Wong a deed in lieu of foreclosure on Builder White's property.[2]

Lenders Day and Wong sued Builder White in 2013 in this Court in a case captioned *Day v. White* over a failed joint venture to develop a seaside residential property.  Judge Lewis granted Lenders Day and White summary judgment as to damages on September 30, 2015.[3] Judge Lewis later defined the damages at $3,908,927.07 and granted additional awards of attorney's fees, costs and expenses, and post-judgment interest.[4]

### *Parties begin negotiating terms to resolve the 2013 case in early 2016.*

In January 2016—in the interim between Judge Lewis determining the entitlement to damages and determining the precise amount of damages—Lender Day approached Builder White to explore resolving the case.[5] Lender Day proposed Builder White "do a total [repair] job on the house" such that "it will be ready for sale or rental," and in exchange, "[u]pon satisfactory completion of the work the lawsuits will be dropped and each party will agree to necessary releases."[6] Lender Day proposed the parties "pick a third party" who "will determine exactly what

needs to be done and [] agree on the specifications and time line of the job."[7] This third party would "also determine when each segment of the agreed up[on] work is completed to the agreed upon specification."[8] Lender Day forwarded Builder White an inspection report ("Report #1") for the property prepared by Inspector David Schnur asking, "[a]fter you read the report[,] let's set up time to review and talk[.]"[9] Builder White responded on March 4, 2016, "[a]ll these things are repairable or replaceable" and "all will be fixed and the place will be beautiful again."[10] Lender Day immediately responded, "[w]hat [the inspector] noted may not be the complete story, but it is at least a reasonable beginning."[11] Builder White wrote back on March 11, 2016, "I'm willing to get started on the work now with a simple statement from you that we are in general agreement on how we will settle. I believe[] we already agree on it."[12] Lender Day responded the next day "[l]et's get an agreement in detail so that there are no further misunderstandings before we start."[13]

Builder White followed up ten days later, "I have the inspection report with all the notes on repairs noted. It might be easier to US mail it to you so you can see exactly what will be done."[14] Lender Day replied six days later, "I received it yesterday and am looking it over this week."[15] . This described "White Report" consists of Builder White's handwritten notes on Report #1. The handwritten notes consists of short remarks such as "repair," "will operate," "replace or repair," "will adjust," "fix roof," "repair ceiling," "correct," "wash," and other similar comments.[16] The White Report concludes with Builder White's signature dated March 21, 2016 stating, "I agree to perform the repairs as noted and have the house look as it was when I transferred it to you."[17]

Lender Day followed up with Builder White in April 2016: "We need to pin down with the help of third parties, perhaps Chris Hanley and David Schnur, detailed specifications on what work you will perform and to what standards you will be held. [] The lawsuit will not be terminated or

dismissed until the project is finished and the third parties agree that you have completed the work to the specifications set forth." [18]

### *The parties reach final terms of the settlement agreement in early June 2016 requiring Builder White substantially complete the defined work by May 31, 2017.*

Builder White emailed Lender Day on May 26, 2016: "I will get the changes [to Version 1] sent today."[19] He followed up five days later telling Lender Day he had "been working on the little modifications" to the March 21, 2016 agreement (described by the parties as "Version 1").[20] And then a week later told Lender Day, "I'm mailing you a signed copy" of Version 1 and he had to "change a few things to reflect the conditions here."[21] Lender Day swears Builder White "never sent either [him or his counsel] a redline copy or comments" to Version 1.[22]

Builder White's early June 2016 commitments (parties describe these obligation as "Version 2") included:

- "White shall commence the Work on Nov. 28, 2016, and shall substantially complete the **Work no later than May 31, 2016**."

- "The following person is hereby appointed to act as Inspector of the Work: David Schnur or anyone designated by Owners ('Inspector'). The Inspector will visit the Property at intervals appropriate to the state of construction to review, inspect and become generally familiar with the progress and quality of the Work. Based on the Inspector's observations and evaluations, the Inspector will report to Owners on the progress and quality of the Work. Owners have the right, in the exercise of Owners' reasonable discretion, to reject any part of the Work which does not meet the quality standards required in this Agreement or which does not fully repair or renovate a deficient condition described in the Report or the Supplement."

- "Owners may terminate this Agreement for reasonable cause if White (a) repeatedly refuses or fails to supply enough properly skilled workers or proper materials, (b) fails to make payment to subcontractors . . . (c) persistently disregards laws, ordinances, or rules and regulations or order of a public authority having jurisdiction, or (d) is otherwise guilty of substantial breach of a provision of this Agreement."

- "**Time is of the essence [in] this Agreement**."[23]

Lender Day swears Builder White revised the March 21, 2016 terms "without our consent and without communicating his intent to do so to us or our lawyers," "signed and sent us his unilaterally revised Agreement" without "copy[ing] it to our attorney," and "took advantage of our collective distraction while [the Lenders experienced health challenges] switching versions of the Draft Agreement, signing an unauthorized version and sending it to me for countersignature."[24] Lender Day signed this early June 2016 version with a date of November 28, 2016.[25]  Lenders now agree with Builder White the parties ultimately agreed to use early June 2016 document (called "Version 2") to define their obligations. Lender Day continued to communicate with Builder White on the progress from July through September 2016.[26]

### *The parties' efforts after October 2016 to substantially complete the repairs by May 31, 2017.*

Inspector Schnur prepared an October 31, 2016 updated home inspection report ("Report #2") which Lender Day shared with Builder White.[27] Inspector Schnur swears the revised report "add[ed] third-party contractor price quotes for the costliest items in need of repair in the house" (termed the "Significant Items" by the parties) representing a "minimum, objective cost estimate" totaling $243,750.[28] The price quote for the Significant Items in Report #2 did "not include all items" listed in Report #1.[29]

Lender Day sent Report #2 to Builder White with an updated version of the settlement agreement (called "Version 3"), stating: "Attached are redline and execution drafts of a revised contract between [us]. [Counsel] has expanded the language and added clarification, but it is still the same document you signed." [30] He furthered added, "[i]f you are agreeable please sign and return and [we] will execute and return to you. We are eager to proceed. The updated report [#2] from Dave Schnur will be attached as an exhibit."[31] Builder White purportedly sent back a signed Version 2 rather than a signed Version 3, which Lender Day then countersigned **o**n November 27,

2016 with a cover email telling Builder White "[a]ttached is the signed agreement and also [the] Dave Schnur report from last April that will be Exhibit A of the agreement." [32] Lender Day added: "There is a six month time deadline to complete your work,[] which should be more than adequate. Dave Schnur will serve as inspector and will make a weekly report to me."[33]

Builder White asked Lender Day on February 19, 2017 for "the original copy of the settle[ment] agreement" and for Lender Day to "send the one with the original signatures."[34] Lender Day replied the next day: "I am working on it. Dar has the original that I should sign again."[35]

### *The parties' conduct after May 31, 2017 anticipated completion date.*

The parties do not address what they did on or around May 31, 2017.  Lender Day asked the Builder on the Fourth of July 2017 as to when the repairs would be "totally finish[ed]."[36] Builder White answered the next day, "[e]very[]thing is just about done."[37] Inspector Schnur completed a home inspection on July 29, 2017 with a report ("Report #3") detailing "[i]mprovements and repairs noted in the original report [#1]" and concluded several unaddressed required repairs and several deficiencies in the repairs.[38]

More silence in the record. No one explained why Builder White did not substantially complete the defined Work by May 31, 2027.   And then Hurricane Maria struck the U.S. Virgin Islands as a Category 5 hurricane on September 19 and 20, 2017. Inspector Schnur conducted another inspection and issued a report as of December 6, 2017 ("Report #4") detailing both the uncompleted repairs and the damage caused by Hurricane Maria.[39]

Inspector Schnur estimated the value of the work completed on the Significant Items identified in Report #2 on February 19, 2018 based upon his inspections.[40] He estimated the value of the work completed by Builder White at the time of this Report  - excluding damages to the

property from Hurricane Maria - to be $65,690 against the initial price quote of repairs in Report #2 estimated at $243,750.[41]

### Lenders end the relationship in March 2018.

Lenders Day and Wong terminated the relationship with Builder White on March 2, 2018 through a "Seven (7) Day Notice of Termination of Construction and Settlement Agreement." [42] The Lenders represented "the parties covenanted that time is of the essence" , "[t]he Work was not substantially completed on May 31, 2017, and has not been substantially completed to date," and Builder White's "failure to complete the Work on or before May 31, 2017 constitutes a substantial breach of the Agreement[.]"[43] The Lenders claimed the repairs conducted "yield[ed] a credit against the Judgment [in the initial litigation] in the amount of $65,690[.]"[44]

### Builder White brings this case for declaratory relief to enforce the settlement terms.

Builder White responded by seeking a declaratory judgment.  He alleged Lenders Day and Wong breached the Agreement by (1) failing to repair damage to the property caused by Hurricane Maria, making it impossible for him to complete his required repairs; (2) attempting to hold him responsible for damage caused by Hurricane Maria; and (3) purportedly terminating the Agreement for cause.[45] Lenders Day and Wong counterclaimed asking us to declare: (1) mutual mistake and fraud in the inducement of the contract such that the Agreement is either reformed or voided; and (2) breach of the Agreement due to failure to complete the required repairs.[46]

The parties adduced evidence.  Inspector Schnur swears Builder White "did not complete in satisfactory or workmanlike manner any of the Significant Items he agreed to correct, except the replacement of the windows," and Builder White "did not complete in satisfactory or workmanlike manner the majority of items in the [White Report]."[47] Lenders Day and Wong submitted a chart comparing the Significant Items as noted in Report #1, Report #2, and White's

Report, which illustrates Builder White's affirmative repair notes on five out of the six Significant Items.[48] Lenders Day and Wong also adduced a chart illustrating all repair items noted in Report #1 against the state of repair at the time of Report #4, which illustrates many of the required repairs remained outstanding, including five of the six Significant Items.[49]

### *Our Court of Appeals remands part of the 2013 case for further damages analysis.*

Our Court of Appeals in February 2019 vacated, in part, Judge Lewis' September 30, 2015 summary judgment Order in the 2013 case finding "judgment on a breach of contract claim that was neither pleaded nor argued by [the Lenders]" instead of granting judgment "against [Defendant] on the BSC Loan, which was the judgment [the Lenders] sought."[50] Our Court of Appeals also affirmed Judge Lewis' September 30, 2015 as to the Loan.[51] So the Lenders amended their 2013 allegations in an August 27, 2020 second amended Complaint, seeking relief against Builder White with allegations conforming to the Court of Appeals' direction.  The Lenders now sued, as part of their 2013 case,  for (1) Builder White's breach of the [parties' 2013] Settlement Agreement in the amount of the Default Sum of the Note"; (2) "[t]he costs of the prosecution of this action and a reasonable attorney's fee[s]"; and (3) "[s]uch other and further relief as to this Court shall seem just and proper."[52]

### II.    Analysis

Lenders Day and Wong now move for summary judgment on the competing requests for declaratory relief concerning the legal import of the early June 2016 settlement terms (which they describe as Version 2).[53] They argue Builder White breached the agreed material term "to repair each and every defective condition at the property specifically listed in the Report and the Supplement" as controlling the scope of the repairs.[54]  Lenders Day and Wong further argue they properly ended the Settlement Agreement when Builder White did not complete the required

repairs by May 31,2017 as agreed by all parties in early June 2016 in Version 2 of their agreement.[55]

Builder White counters we should read their contractual obligations "as a whole" with no provision is rendered superfluous. He argues the recitals should be read as limiting the scope of repairs to the handwritten notes in the White Report. We find no genuine issue of material fact on the requirement Builder White substantially complete the repairs on the home by May 31, 2017 and he did not.  He cannot now claim the benefit of settlement terms he did not honor.  We are not persuaded by his arguments beyond this point.

The elements of a breach of contract claim are (1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages.[56] The parties here had an Agreement wherein the Builder "covenants and agrees to repair each and every defective condition at the Property specifically listed in [Report #1]."[57] Further, the Agreement stated that the Builder "shall commence the Work on Nov. 28, 2016, and shall substantially complete the Work no later than May 31, 2017," a time period of six months.[58] Such provisions in the Agreement created a duty to so perform. Failure to complete the required construction or repairs can constitute breach of contract.[59] Failure to complete construction *on the timeline agreed to* in a construction contract can additionally constitute breach of contract.[60]

Lenders submitted an abundance of evidence confirming they conditioned their obligation to dismiss the 2013 case upon Builder White substantially completing all the repairs listed in an inspection report prepared by a third party.  For example, Lender Day told Builder White:

- January 13, 2016: "For this to work we would have to develop a detailed list of the work you would do, detailed specifications of what this work would entail, and a method of certifying that the work was completed to agreed upon specifications."[61]

- February 15, 2016: "We pick a third party, who together with you and Hanley, will determine exactly what needs to be done and [] agree on the specifications and time line of the job. . . This person will also determine when each segment of the agreed up work is completed to the agreed upon specification."[62]

- March 3, 2016: "After you read [Report #1] let's set up time to review and talk[.]"[63]

- March 11, 2016: "What Dave Schur noted [in Report #1] may not be the complete story, but it is at least a reasonable beginning. When we talk or email let me know your solution to the problems he highlighted."[64]

- April 2, 2016: "We need to pin down with the help of third parties, perhaps Chris Hanley and David Schnur, detailed specifications on what work you will perform and to what standards you will be held. [] The lawsuit will not be terminated or dismissed until the project is finished and the third parties agree that you have completed the work to the specifications set forth."[65]

- April 23, 2016: "We agree on what has to be done. . . . A third party or parties. Chris Hanley plus the House guy[]. They decide that you have completed the job according to specifications."[66]

- July 9, 2016: "David Schnur and Chris Hanley will be supervising the work that will be done on the house and determining if it is of good quality and meet specifications. Schnur wants to identify and review the sub contracts on the property as well [] what you will be doing directly."[67]

- September 6, 2016: "[M]y plan is to have Tom Nolte come down there for a least a week to go over in detail with you the repairs to be done and how to accomplish them[.] . . . We would still use Dave Schnur to certify when each repair was completed and Hanley's advice on what it will take to make [the property] sal[e]able."[68]

- October 13, 2016: "Dave Schnur is updating his report relative to the work to be done."[69]

- October 31, 2016: "Attached are redline and execution drafts of a revised contract between [us]. [Counsel] has expanded the language and added clarification, but it is still the same document you signed. If you are agreeable please sign and return and [we] will execute and return to you. We are eager to proceed. The updated report [#2] from Dave Schnur will be attached as an exhibit."[70]

- November 27, 2016: "Attached is the signed agreement and also Dave Schnur report from last April that will be Exhibit A of the agreement. There is a six month time deadline to complete your work,[] which should be more than adequate. Dave Schnur will serve as inspector and will make a weekly report to me."[71]

There is no evidence the Lenders intended for Builder White to limit the scope of repairs in the form of the Builder's handwritten notes or otherwise.

The parties agreed in the early June 2016 Version 2 for substantially all the Work be completed no later than May 31, 2017. Hurricane Maria struck the U.S. Virgin Islands as a Category 5 hurricane on September 19 and 20, 2017. Builder White's argument Hurricane Maria impacted his ability to complete the repairs and construction as required under the Agreement is a red herring, because Hurricane Maria occurred more than three and a half months after the required completion deadline in the Agreement. For an early June 2016 Agreement spanning six months total for completion time with a "time is of the essence" clause, and where there is no evidence the Lenders invited or agreed to a delay until September 2017, the three and a half months between the expected completion date of the repairs and the landfall of Hurricane Maria represents a significant time period following the agreed upon completion deadline need not be considered when determining whether Builder White breached *the contractual provisions*.[72]

We also note when Lender Day inquired with Builder White on July 4, 2017 as to when the repairs would be "totally finish[ed],"[73] Builder White represented"[e]very[]thing is just about done" on July 5, 2017.[74] Such a response does not accord with Builder White's argument today the Lenders breached the Agreement by failing to repair damage to the property caused by Hurricane Maria in September 2017, making it impossible for him to complete his required repairs.[75]

11

And a comparison of Report #1 and Report #3, completed before Hurricane Maria, shows Builder White did not complete—in substantial portion—repairs of "each and every defective condition at the Property specifically listed in [Report #1]:"[76]

| Report #1<br>Defective Condition | Report #3<br>Status of Defective Condition |
|---|---|
| The ceiling fan did not operate when tested, power was out in these rooms. | Ceiling fan not working at time of inspection. |
| Wood flooring in den area was severely water damaged and should be replaced. | Basic builder's grade carpet appears to have been poorly installed over damaged wood plank floor in den. |
| No [Ground-Fault Circuit Interrupter ("GFCI")] protection present at sink in master bath, suggest installing GFCI protected receptables for safety. GFCI in bath #2 did not respond to test, suggest replacing for safety. No power in half bath at time of inspection, unable to test. | GFCI's called out in original report have not been replaced. |
| - | Kitchen faucet is not properly installed, water leaks under cabinet when faucet is open. |
| The A/C units did not operate at time of inspection, suggest further evaluation by qualified A/C tech. | There are three separate central A/C units. All three unites were not working at time of inspection. |
| Several areas of rust and corrosion noted. Suggest consulting with a qualified roofing contractor to fully understand the scope of work involved to repair the roof and gutters. | There are still several areas of corrosion and rust though noted. |
| Suggest further inspection [of the pool] by a qualified pool repair person to assess all repairs needed. | Pool and spa were empty at time of inspection. Pool equipment (pumps, filters, timer) could not be evaluated at time of inspection. Pool surface has been refinished. |

The Lenders noted several of the conditions noted above in Report #2 with additional detail. For example, regarding the damaged wood flooring, Inspector Schnur in Report #2 commented: "[e]xpect to pay about $3,200 to remove old floor and prep and install new tile."[77] Regarding the A/C units, Report #2 noted: "[c]omplete replacement of the existing units is $40,530. This does not include any drywall or plaster repair or painting."[78] Regarding the roofing, Report #2 added: "[Subcontractor] Rooftops states that due to the extent of damage noted on the

roof, they will only do the job if it is a complete tear-off and replacement. Their quote of $90,000 does not include any structural damage that may be found during the roof removal. . . ."[79] A conclusion that the construction was incomplete at the time of the deadline of the contract is further supported by the Schnur Affidavit's statement that, "[b]ased on [Schnur's] previous inspection, [Schnur] determined that the Builder] did not complete in satisfactory or workmanlike manner any of the Significant Items he agreed to correct, except the replacement of the windows," and that the Builder "did not complete in satisfactory or workmanlike manner the majority of items in the [White Report]."[80]

We find this evidence is such no factfinder could return a verdict finding Builder White met his obligations to make specific repairs on a specific timeline and Builder White did not breach the operative Version 2 of the Agreement.[81]  Builder White also does not argue the sufficiency or timeliness of the repairs. He argues only for us to rewrite the terms to allow him a more limited scope of work.[82]  We may not do so.

We further find damage to the Lenders by Builder White's material default in timely performance.[83] The Lenders established, through Inspector Schnur's Estimate, a value of $178,060 in expected but unperformed repairs.[84] Builder White does not adduce evidence to rebut the estimated value of repairs not performed.[85]

We find the Lenders overwhelmingly met their burden to demonstrate, as a matter of law without genuine issues of material fact, Builder White breached the material agreed terms of the early June 2016 Version 2 of their agreement. This breach allowed the Lenders to terminate their obligation to dismiss the 2013 case.[86]  Builder White offers no basis for us to declare the Lenders must dismiss the 2013 case because he did not breach the early June 2016 Agreement. We grant summary judgment in favor of the Lenders.

13

### III.    Conclusion

The parties attempted to settle their ongoing 2013 case (at No. 1:13-44) through a agreement requiring Builder White repair the home and restore it to saleable or rentable condition within a six-month time period. The repairs did not occur.  The parties sued each other looking for a declaratory judgment as to whether Builder White did not breach his obligations under the early June 2016 agreement.  Lenders Day and Won met their burden in demonstrating Builder White did not complete the required repairs by May 31, 2017 in an agreement where the parties agreed time is of the essence. The Lenders properly terminated their obligations to dismiss their 2013 case.

The adduced evidence compels our finding of no genuine issue of material fact on Builder White's failure to timely perform by May 31, 2017.   We grant summary judgment in favor of the Lenders requiring we declare Defendants properly terminated their obligations to dismiss the 2013 case.  We grant the Lenders leave to timely petition for reasonable attorney's fees compliant with our Policies if they wish to chase this case rather than now resolving this decade-old dispute.

---

[1] *Day v. White*, 764 F. App'x. 164, 165 (3d Cir. 2019).

[2] *Id.*; *See* No. 1-13-cv-44 (D.V.I.).

[3] *Day v. White*, 2015 WL 5735787 at *1 (D.V.I. Sept. 30, 2015) (requiring the "the specific amount of damages to be awarded" to be "established with specificity . . . in further proceedings[.]"), *aff'd in part, vacated in part, remanded,* 764 F. App'x. 164 (3d Cir. 2019).

[4] *Day v. White*, 2017 WL 2563234 at *26 (D.V.I. June 12, 2017), *aff'd in part, vacated in part, remanded,* 764 F. App'x. 164 (3d Cir. 2019).

[5] ECF 58-4 at 2. Lender Day added: "[f]or this to work we would have to develop a detailed list of the work you would do, detailed specifications of what this work would entail, and a method of certifying that the work was completed to agreed upon specifications." *Id.*

14

[6] *Id.* at 4.

[7] *Id.* Lender Day added: "This person will also determine when each segment of the agreed up work is completed to the agreed upon specification." *Id.*

[8] *Id.*

[9] *Id.* at 50.

[10] *Id.* at 49.

[11] *Id.* Lender Day added: "When we talk or email let me know your solution to the problems [Inspector Schnur] highlighted." *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at 49.

[15] ECF 62-3 at 2, ECF 62-4 at 1 (duplicate emails).

[16] ECF 58 at 3, 5, 7, 9, 24, 36. We see no handwritten notes in the White Report suggesting a repair is not possible or would not be done.

[17] *Id.* at 42.

[18] ECF 58-5 at 44. Later in April 2016, Lender Day added: "We agree on what has to be done. . . . A third party or parties. Chris Hanley plus the House guy[]. They decide that you have completed the job according to specifications." ECF 62-5 at 1.

[19] *Id.* at 54.

[20] ECF 62-7 at 1.

[21] ECF 62-6 at 1. There is nothing in the record suggesting the Lenders countersigned revisions proposed to Version 1 by the Builder.

[22] ECF 58-3 at 4.

[23] ECF 58-6 at 50–52 (emphasis added).

[24] ECF 58-3 at 6–7. Neither party produced the underlying email Builder White sent to Lenders Day and Wong.

[25] ECF 58-6 at 53 (signature page); *see also* ECF 58-3 at 7 (Lender Day characterizing the signed version as "my mistakenly signed version of the Agreement redrafted by White").

[26] *See, e.g.*, ECF 58-5 at 56 ("David Schnur and Chris Hanley will be supervising the work that will be done on the house and determining if it is of good quality and meet specifications. Schnur wants to identify and review the sub contracts on the property as well [] what you will be doing directly."); ECF 58-5 at 58 ("[M]y plan is to have Tom Nolte come down there for a least a week to go over in detail with you the repairs to be done and how to accomplish them[.] . . . We would still use Dave Schnur to certify when each repair was completed and Hanley's advice on what it will take to make [the property] sal[e]able.").

[27] ECF 58-5 at 77–78. Lender Day told Builder White earlier in October 2016, "Dave Schnur is updating his report relative to the work to be done." ECF 58-5 at 60.

[28] ECF 58-8 at 2.

[29] *Id.*

[30] ECF 58-5 at 62.

[31] *Id.*

[32] ECF 58-6 at 48.

[33] *Id.*

[34] ECF 62-9 at 1. The parties did not submit relevant communications between them from December 2016 to January 2017.

[35] *Id.* The parties did not submit relevant communications between them from March 2017 through June 2017.

[36] *Id.* at 57.

[37] *Id.*

[38] ECF 58-7 at 2–16.

[39] *Id.* at 18–60.

[40] ECF 58-7 at 62.

[41] *Id.*

[42] ECF 58-9 at 2-3.

[43] *Id.*

[44] *Id.* at 3.

16

[45] ECF 1 at 7-8.

[46] ECF 22 at 9-11.

[47] ECF 58-8 at 3.

[48] ECF 58-6 at 45–46.

[49] ECF 58-7 at 63–64.

[50] *Day*, 764 F. App'x at 166.

[51] *Id.* at 165. Lenders moved for "Entry of Partial Final Judgment," *Day v. White*, No. 13-44, ECF 105, seeking $2,453,874.02 as to Count Two of their first amended Complaint in the 2013 case based upon the Court of Appeals' affirmance of Judge Lewis's summary judgment as to the Wong/Day Loan. *Day v. White*, No. 1: 2013-44, ECF 105 at 4. Judge Lewis granted the Lenders' motion for partial final judgment "in the amount of $2,453,874.02 for damages associated with the Amended Wong/Day Loan." *Day v. White*, No. 1: 2013-44, ECF 113 at 2.

[52] *Day v. White*, No. 13-44, ECF 111 at 3.

[53] Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party does not prevent summary judgment. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When determining whether a disputed fact is genuine, we draw all inferences in favor of the non-moving party. *Id*. We do not weigh evidence or make credibility determinations. *Spivack v. City of Phila.*, 109 F.4th 158, 165-66 (3d Cir. 2024) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021)).The Supreme Court "outlined two closely related methods for a movant to succeed at summary judgment": (1) under the "standard approach," the moving party may produce material facts, genuinely undisputed, entitling it to judgment as a matter of law; and (2) under the "*Celotex* approach," the moving party "may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case … *on which that party will bear the burden of proof at trial*." *Mall Chevrolet, Inc. v. General Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Summary judgment is appropriate where the nonmoving party does not make a showing sufficient to establish the existence of an element essential to its case and on which it bears the burden of proof at trial. *SodexoMAGIC*, 24 F.4th at 204 (citing *Celotex Corp.*, 477 U.S. at 322).

[54] ECF 58-1 at 14–16.

[55] *Id.* The Lenders make two additional arguments. First, the Agreement is void *ab initio* because it does not represent a "meeting of the minds" on the scope of the required repairs and because the Builder allegedly unilaterally revised the Agreement—without the Lenders' awareness—before

the Lenders countersigned the Agreement. *Id.* at 11–13. We need not evaluate this argument because the Agreement—the version signed by both the Lenders and the Builder—defines an agreed timeline for completion of the repairs which the Builder indisputably did not meet. ECF 58-6 at 50-52. Second, the Lenders argue the "whereas" clause, "WHEREAS, Owners wish to engage White to accomplish the repairs of the Property to cure the defects in the Report as specifically noted by White" is not binding because such clause is a prefatory recital and not a substantive obligation of the Agreement. ECF 58-1 at 13–14.

The Lenders correctly identify clauses beginning with "whereas" at the beginning of contract are referred to as the "recitals in a contract," and are "merely explanations of the circumstances surrounding the execution of the contract and are not binding obligations unless referred to in the operative provisions of the contract." *Arconic Corp. v. Novelis Inc.*, 2023 WL 4533665 at *8 (W.D. Pa. July 13, 2023); *see also Mozdzierz v. Accenture, LLP*, 2010 WL 4273323 at *6 (E.D. Pa. Oct. 29, 2010) (same). Our Court of Appeals and our colleagues interpreting contract law are uniform in this conclusion. *See, e.g.*, *Electra Realty Co. Inc. v. Kaplan Higher Educ. Corp.*, 825 F. App'x. 70, 73 (3d Cir. 2020) ("A recital provision, though it may provide background information or serve as an interpretative aid, does not control over the operative terms of a contract."); *Arconic Corp.*, 2023 WL 4533665 at *8 (same); *Sorathia v. Fidato Partners, LLC*, 483 F.Supp.3d 266, 276 (E.D. Pa. 2020) ("While these 'WHEREAS' clauses in and of themselves are not binding obligations, they are 'explanations of the circumstances surrounding the execution of the contract' and are 'useful as an aid to interpretation.'"); *see also Grynberg v. F.E.R.C.,* 71 F.3d 413, 416 (D.C.Cir.1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond those arising from the operative terms of the document."). We only look to recitals to interpret the contract when the operative clauses are ambiguous. *In re Scott*, 600 B.R. 506, 509 (Bankr. W.D. Pa. 2019) ("As such, recitals to a contract will not control the operative clauses of that contract unless the operative clauses are themselves ambiguous.").

But we need not reach this argument because the substantive provisions of the Agreement, and not the recitals at start of the contract, control the scope of the repairs required by the Agreement. First, the operative provision of the Agreement is unambiguous, because it can only be reasonably read to have a single meaning. *See Sunshine Shopping Ctr., Inc. v. KMart Corp.*, 85 F.Supp.2d 537, 540 (D.V.I. 2000) ("A contract provision is considered ambiguous if it is susceptible to two reasonable alternative interpretations.").

Builder White and the Lenders Day and Wong agreed:

> The Work. The term "Work" means the repair services, including all labor, materials, equipment[],tools, utilities, transportation, and other facilities and services provided or to be provided by White to fulfill White's specific obligations under this Agreement. To accomplish the Work **White covenants and agrees to repair each and every defective condition at the Property specifically listed in the Report and the Supplement.**

ECF 58-6 at 50 (emphasis added). There is no possible reasonable, alternative interpretation of "[Builder]White covenants and agrees to repair each and every defective condition at the Property

specifically listed in the Report and the Supplement"; the plain language of this provision is entirely clear. *See Sunshine Shopping Ctr, Inc.*, 85 F.Supp.2d at 540 ("[T]he Third Circuit applies the 'plain meaning rule' of interpretation of contracts, which assumes that the intent of the parties to an instrument is 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'"). Builder White's suggestion we unilaterally limit this language only require the repairs list in the Report he "indicate[d]" "he was willing to perform as part of the agreement," ECF 62 at 7, is not a possible interpretation of the plain language of this provision.

[56] *Cannon v. Fulcrum Constr., LLC*, 2023 VI SUPER 78U at *7 (Super. Ct. Dec. 12, 2023) (citing *Basic Servs., Inc. v. Gov't of the V.I.*, 71 V.I. 652, 653 (2019)).

[57] ECF 58-6 at 50.

[58] *Id.*

[59] *Hewitt v. Morton,* No. 1992-cv-771, 1999 WL 35792711 at *5 (Terr.V.I. Apr. 14, 1999), *aff'd* 202 F.Supp.2d 394 (D.V.I. 2002), *aff'd*, 78 F. App'x 793 (3d Cir. 2003)("In the absence of special provisions in the contract, the contractor's obligations end upon the completion of the structure in accordance with the terms of the contract. Where a party to a building or construction contract fails to comply with the duty imposed by the terms of the contract, a breach results for which an action may be maintained to recover the damages sustained thereby." (citation omitted)).

[60] *See Cebedo v. Carty*, No. SX-10-CV-99, 2011 WL 13389271 at *2 (V.I. Super. Ct. June 13, 2011) ("A closer inspection of the Construction Agreement indicates that Defendant Carty was supposed to begin construction by October 1, 2009 and complete such construction within 60 days. Based on the record in front of the Court, the Court finds that Defendant Carty failed to complete the construction within the deadline set forth in the Construction Agreement, and thereby rendering him in breach of the Construction Agreement."); *Hewitt*, 1999 WL 35792711 at *6 ("Where a construction contract is to be performed 'by' a particular time, it must be performed before such time.").

[61] ECF 58-4 at 2.

[62] ECF 58-4 at 4.

[63] ECF 58-4 at 50.

[64] ECF 58-4 at 49.

[65] ECF 58-5 at 44.

[66] ECF 62-5 at 1.

[67] ECF 58-5 at 56.

[68] ECF 58-5 at 58.

[69] ECF 58-5 at 60.

[70] ECF 58-5 at 62.

[71] ECF 58-6 at 48.

[72] *Cf. Cannon* 2023 VI SUPER 78U at *8 (finding failure to complete construction in "the time within which a contract is to be performed by a contractor" may be excused when the owner affirmatively "waives the delay" and "none of the [contracts] contained a 'time is of the essence' clause").

[73] ECF 58-6 at 57.

[74] *Id.*

[75] ECF 1 at 8.

[76] ECF 58-6 at 50.

[77] ECF 58-6 at 7.

[78] *Id.* at 26.

[79] *Id.*

[80] ECF 58-8 at 3.

[81] *See Cebedo*, 2011 WL 13389271 at *2 ("Based on the record in front of the Court, the Court finds that Defendant Carty failed to complete the construction within the deadline set forth in the Construction Agreement, and thereby rendering him in breach of the Construction Agreement."); *Hewitt*, 1999 WL 35792711 at *10 ("There is no question that the work at Plot 37 was *not* substantially performed by Defendant and that he materially breached the contract." (emphasis in original)); *SodexoMAGIC, LLC*, 24 F.4th at 203-4 (a factual dispute is genuine only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

[82] *Cf. Cebedo*, 2011 WL 13389271 at n.2 ("Defendant Carty did not plead in his Answer any affirmative defenses including that he completed the construction under the Construction Agreement within the deadline."). There is evidence to suggest that the Builder did not complete even this more limited scope of work. ECF 58-8 at 3 (stating in the Schnur Affidavit that the Builder "did not complete in satisfactory or workmanlike manner the majority of items in the [White Report].").

[83] *See Hewitt*, 1999 WL 35792711 at *11 ("For breach due to defective performance or due to abandonment of the contract, an injured party can get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, so long as this is possible and does not involve unreasonable economic waste.").

[84] ECF 58-7 at 62; *see also Hewitt*, 1999 WL 35792711 at *5 ("Where a party to a building or construction contract fails to comply with the duty imposed by the terms of the contract, a breach results for which an action may be maintained to recover the damages sustained thereby.").

[85] *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (if the moving party meets their burden, the burden shifts to the nonmoving party to "go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there *is* a genuine issue for trial").

[86] ECF 58-9 at 2–3.